ACCEPTED
03-14-00197-CV
5275952
THIRD COURT OF APPEALS
AUSTIN, TEXAS
5/13/2015 5:40:15 PM
JEFFREY D. KYLE
CLERK

## NO. 03-14-00197-CV

_____

RECEIVED IN
3rd COURT OF APPEALS
AUSTIN, TEXAS
5/13/2015 5:40:15 PM
JEFFREY D. KYLE
Clerk

# IN THE COURT OF APPEALS
# FOR THE THIRD JUDICIAL DISTRICT
# AUSTIN, TEXAS

_____

## GRAPHIC PACKAGING CORPORATION,
### Appellant,

### v.

## GLENN HEGAR, COMPTROLLER OF PUBLIC ACCOUNTS OF THE STATE OF TEXAS, AND KEN PAXTON, ATTORNEY GENERAL OF THE STATE OF TEXAS,

### Appellees.

_____

ON APPEAL FROM THE 353RD JUDICIAL DISTRICT COURT
TRAVIS COUNTY, TEXAS

_____

## BRIEF OF AMICI CURIAE STATES OF OREGON, ALASKA, CALIFORNIA, COLORADO, HAWAII, MICHIGAN, MINNESOTA, MONTANA, NEW MEXICO, AND WASHINGTON IN SUPPORT OF TEXAS COMPTROLLER OF PUBLIC ACCOUNTS AND TEXAS ATTORNEY GENERAL

_____

ELLEN F. ROSENBLUM
Oregon Attorney General

ANNA JOYCE
Oregon Solicitor General

DARREN WEIRNICK
Senior Assistant Attorney General
darren.weirnick@doj.state.or.us
Oregon Dept. of Justice
1162 Court Street NE
Salem, OR 97301
Tele: (503) 947-4530
Fax: (503) 378-3784

[additional attorneys on next page]

CRAIG W. RICHARDS
Attorney General of Alaska
P.O. Box 110300
Juneau, Alaska 99811

KAMALA D. HARRIS
Attorney General of California
455 Golden Gate, Suite 11000
San Francisco, CA 94102-7004

CYNTHIA COFFMAN
Colorado Attorney General
Ralph L. Carr Colorado Judicial Ctr
1300 Broadway, 10th Floor
Denver, Colorado 80203

DOUGLAS S. CHIN
Attorney General of Hawaii
425 Queen Street
Honolulu, Hawaii 96813

BILL SCHUETTE
Michigan Attorney General
P. O. Box 30212
Lansing, MI  48909

LORI SWANSON
Attorney General of Minnesota
102 State Capitol
75 Rev. Dr. Martin Luther King Jr. Blvd.
St. Paul, MN 55155-1609

TIM FOX
Montana Attorney General
Office of the Attorney General
215 N Sanders, Third Floor
P.O. Box 201401
Helena, MT 59620-1401

HECTOR H. BALDERAS
Attorney General of New Mexico
P. O. Drawer 1508
Santa Fe, NM  87504-1508

ROBERT W. FERGUSON
Attorney General of Washington
1125 Washington Street SE
P.O. Box 40100
Olympia, WA  98504-0100

**COUNSEL FOR *AMICI CURIAE***

# TABLE OF CONTENTS

STATEMENT OF INTEREST OF AMICI CURIAE........................................................ 1

INTRODUCTION ......................................................................................................... 1

ARGUMENT .................................................................................................................. 5

I.     THE COURT SHOULD REJECT GRAPHIC'S UNCRITICAL RELIANCE ON "COMPACT LAW" CASES..................................................................5

     A.     An agreement between sovereign states does not bind a future legislature except under the Compact Clause or Contract Clause. ...............6

     B.     Because the Compact Clause does not apply to the tax compact, Graphic's reliance on "compact law" cases decided under that clause is misplaced..................................................................................................7

     C.     Because the tax compact did not require or receive Congressional consent, the compact trumps Texas Tax Code § 171.106 only if Texas Tax Code § 171.106 unconstitutionally impairs the obligation of contracts. ....................................................................................................9

II.     THE TAX COMPACT PERMITS MEMBER STATES TO ADOPT AN EXCLUSIVE APPORTIONMENT FORMULA SUCH AS TEXAS TAX CODE § 171.106 ...................................................................................................11

     A.     The states did not unmistakably intend to suspend their power to adopt an exclusive apportionment formula.....................................................12

     B.     The states' course of performance confirms that each state intended to retain sovereign authority to adopt an exclusive apportionment formula without first withdrawing from the compact under Article X.2........................................................................................................17

     C.     Construing the tax compact as the amici suggest does not require the court to insert "absent terms," but rather to discern the states' intent using constructional principles under the Contract Clause. .........................21

     D.     The threat of Congressional action in 1967 does not show that the states intended Article III.1 to contractually bind subsequent state legislatures. .............................................................................................24

III.     TEXAS TAX CODE § 171.106 DOES NOT SUBSTANTIALLY IMPAIR ANY CONTRACTUAL RELATIONSHIP.............................................................26

CONCLUSION ............................................................................................................. 29

i

TABLE OF AUTHORITIES

**Cases**

*Alabama v. North Carolina*,
    560 U.S. 330, 352, 130 S.Ct. 2295 (2010) ................................................. 21, 22, 23

*Allied Structural Steel Co. v. Spannaus*,
    438 U.S. 234, 246, 98 S.Ct. 2716 (1978) ............................................................. 27

*Atlantic Coast Line R. Co. v. Phillips*,
    332 U.S. 168, 173, 67 S.Ct. 1584 (1947) ............................................................ 13

*C.T. Hellmuth v. Washington Metro. Area Transit Auth.*,
    414 F.Supp. 408, 409 (D. Md. 1976)................................................................... 14

*Central Power & Light Co. v. Pub. Util. Comm'n.*,
    649 S.W.2d 287, 289 (Tex. 1983) ........................................................................ 6

*Chandler v. Jorge A. Gutierrez, P.C.*,
    906 S.W.2d 195, 203 n.10 (Tex. App.—Austin 1995, writ denied) ...................... 6

*Cuyler v. Adams*,
    449 U.S. 433, 440, 101 S.Ct. 703, 708 (1981) ...................................................... 7

*Droemer v. Transit Mix Concrete of Gonzales, Inc.*,
    457 S.W.2d 332, 335 (Tex. App.—Corpus Christi 1970, no writ) ....................... 18

*Energy Reserves Group, Inc. v. Kansas Power & Light Co.*,
    459 U.S. 400, 411, 103 S.Ct. 697 (1983) ....................................................... 26, 27

*Firstar Corp. v. Comm'r*,
    575 N.W.2d 835, 838 (Minn. 1998) .................................................................... 19

*General Expressways, Inc. v. Iowa Reciprocity Board*,
    163 N.W.2d 413, 419-420 (Iowa 1968) .............................................................. 10

TABLE OF AUTHORITIES

*General Motors Corp. v. Romein*,

    503 U.S. 181, 189, 112 S.Ct. 1105 (1992)......................................................... 27

*Gillette Co. and Subsidiaries v. California Franchise Tax Board*,

    Cal. S. Ct. S206587 ...................................................................................... 19

*HealthNet, Inc. and Subsidiaries v. Department of Revenue*,

    Or. Tax Court TC No. 5127............................................................................ 20

*In re C.B.*, 188 Cal.App.4[th] 1024,

    116 Cal.Rptr.3d 294 (2010) ......................................................................... 10

*In re Alexis O.*, 959 A.2d 176, 180 (N.H. 2008) ............................................ 9

*In re D.B.*, 431 A.2d 498 (Vt. 1981)................................................................ 9

*In re O.M.*, 565 A.2d 573 (D.C. Ct. App. 1989) ..................................... 10, 11

*Ingram Micro. Inc. v. Mich. Dep't. of Treasury*,

    No. 11-000035-MT, slip op. (Mich. Ct. Cl. Dec. 19, 2014)................................... 20

*International Business Machines Corp. v. Department of Treasury*,

    852 N.W.2d 865 (Mich. 2014) ..................................................................... 20

*Jefferson Branch Bank v. Skelly*,

    66 U.S. (1 Black) 436, 446, 17 L.Ed. 173 (1862) ........................................... 12, 15

*Kimberly-Clark Corp. and Subsidiaries v. Commissioner*,

    Minn. Tax Ct. No. 8670-R............................................................................ 19

*McComb v. Wambaugh*, 934 F.2d 474, 479 (3d Cir. 1991) ................................. 9, 10

*MJR Corp. v. B&B Vending Co.*,

    760 S.W.2d 4, 15 (Tex. App.—Dallas 1988, writ denied)................................... 13

iii

*Tarrant Reg'l Water Dist. v. Herrmann*,
  569 U.S. __, 133 S.Ct. 2120, 2130 n.8 (2013) ...................................................... 8, 18

*United States Steel Corp. v. Multistate Tax Commission*,
  434 U.S. 452, 473, 98 S.Ct. 799 (1978) ...................................................... 8, 14, 25

*United States Trust Co. of New York v. New Jersey*,
  431 U.S. 1, 24 n.21, 97 S.Ct. 1505 (1977) ...................................... 13, 16, 22, 26, 27

*United States v. Price*,
  361 U.S. 304, 310-311, 80 S.Ct. 326 (1960) .......................................................... 24

*United States v. Winstar Corp.*,
  518 U.S. 839, 874-75, 116 S.Ct. 2432 (1996) .................................................. 12, 13

**Statutes**

Ala. Code § 40-27-1 (2011)........................................................................................ 20
Ark. Code Ann. § 26-5-101 (1995) ............................................................................ 20
Ark. Code Ann. § 26-51-709 ...................................................................................... 20
Cal. Rev. & Tax Code § 25128(a) (1993) .................................................................. 19
Colo. Rev. Stat. § 24-60-1301 ................................................................................... 20
Colo. Rev. Stat. § 39-22-303.5(2) (2009).................................................................. 20
D.C. Code § 47-411 (2013) ....................................................................................... 20
Fla. Stat. § 214.71 ...................................................................................................... 19
Fla. Stat. § 220.15(4) ................................................................................................. 19
Idaho Code § 63-3027(i)(1)........................................................................................ 19
Mich. Comp. Laws § 208.1301 .................................................................................. 20
N.D. Cent. Code § 57-59-01, *as amended by* S.B. 2292 (2015) ............................... 20
Or. Rev. Stat. § 314.606 ............................................................................................ 20
Or. Rev. Stat. § 314.606 (1993).................................................................................. 20
Or. Rev. Stat. § 314.650(1) (1993) ............................................................................. 20
Or. Rev. Stat. § 305.653 (2013).................................................................................. 20

# TABLE OF AUTHORITIES

Texas Tax Code § 141.001 ...................................................................................... 1

Texas Tax Code § 171.106 .......................................... 1, 2, 3, 4, 9, 11, 12, 26, 27, 29

## Other Authorities

1A Norman J. Singer & J.D. Shambie Singer, *Sutherland Statutes and Statutory Construction* § 32:8 (7th ed. 2009)........................................................................ 7

J. Murray, *Corbin on Contracts* § 45.6 at 92 (rev. ed. 2007) ...................................... 14

*Restatement (Second) of Contracts* § 202, *comment g* (1981) ................................... 17

## Laws

1971 Fla. Laws ch. 71-984 § 1 (eff. Jan. 1, 1972)........................................................ 19

1987 Minn. Laws 1039, 1098-1120 .............................................................................. 19

1993 Cal. Stat. 946 (S.B. 1176)..................................................................................... 19

1993 Or. Laws 726, § 20 (H.B. 2058) ........................................................................... 20

1994 Idaho Sess. Laws 301 (H.B. 897) ......................................................................... 19

1995 Ark. Acts 682......................................................................................................... 20

2008 Colo. Sess. Laws 256 (H.B. 08-1380) .................................................................. 20

2010 Utah Sess. Laws 155, § 1 (S.B. 165) .................................................................... 20

2011 Ala. Acts 2011-616 (H.B. 434) ............................................................................ 20

2012 Cal. Stat. 37 (S.B. 1215)....................................................................................... 19

2013 D.C. Stat. 20-61, § 7342 ....................................................................................... 20

2013 Minn. Laws 143 ..................................................................................................... 19

2013 Or. Laws 407 (S.B. 307)........................................................................................ 20

2014 Mich. Pub. Acts 282 .............................................................................................. 20

## Constitutional Provisions

Alaska Const. art. IX, § 1 ............................................................................................... 15

Ark. Const. art. 16, § 7 .................................................................................................. 15

Cal. Const. art. XIII, § 31 .............................................................................................. 15

Haw. Const. art. VII, § 1................................................................................................. 15

Ill. Const. art. IX, § 1..................................................................................................... 15

Mich. Const. art. IX, § 2 ........................................................................................ 15

Minn. Const. art. X, § 1 ......................................................................................... 15

Mo. Const. art. X, § 2 ............................................................................................ 15

Mont. Const. art. VIII, § 2 ..................................................................................... 15

N.D. Const. art. X, § 2 ........................................................................................... 15

S.D. Const. art. XI, § 3 .......................................................................................... 15

Tex. Const. art I, § 16 ............................................................................................. 6

Tex. Const. art VIII, § 4 ......................................................................................... 15

U.S. Constitution, Article I, § 10, clause 1 ............................................................. 6

U.S. Constitution, Article I, § 10, clause 3 ............................................................. 6

U.S. Constitution, Article VI, § 2 ........................................................................... 7

Wash. Const. art. VII, § 1 ...................................................................................... 15

Wyo. Const. art. 15, § 14 ....................................................................................... 15

## Legislation

H. R. 11798, 89th Cong., 1st Sess. (1965) ............................................................ 25

H.R. 1538, 92d Cong., 1st Sess. (1971) ................................................................ 25

H.R. 1538, 92d Cong., 2d Sess. (1972) ................................................................. 25

H.R. 16491, 89th Cong., 2d Sess. (1966) .............................................................. 25

H.R. 2158, 90th Cong., 1st Sess. (1967) ............................................................... 25

H.R. 2179, 91st Cong., 1st Sess. (1969) ............................................................... 25

H.R. 7906, 91st Cong., 1st Sess. (1969) ............................................................... 25

H.R. 9, 94th Cong., 1st Sess. (1975) ..................................................................... 25

H.R. 977, 93d Cong., 1st Sess. (1973) .................................................................. 25

S. 1210, 92d Cong., 1st Sess. (1971) ..................................................................... 25

S. 1245, 93d Cong., 1st Sess. (1973) ..................................................................... 25

S. 1883, 92d Cong., 1st Sess. (1971) ..................................................................... 25

S. 2080, 94th Cong., 1st Sess. (1975) .................................................................... 25

S. 2092, 93d Cong., 1st Sess. (1973) ..................................................................... 25

S. 282, 93d Cong., 1st Sess. (1973) ....................................................................... 25

S. 317, 92d Cong., 1st Sess. (1971) ....................................................................... 25

TABLE OF AUTHORITIES

S. 3333, 92d Cong., 2d Sess. (1972) .......................................................................... 25

S. 4080, 92d Cong., 2d Sess. (1972) .......................................................................... 25

S. 916, 91st Cong., 1st Sess. (1969) .......................................................................... 25

## STATEMENT OF INTEREST OF *AMICI CURIAE*

This case concerns, in part, the proper interpretation of the Multistate Tax Compact (the "tax compact"), which Texas joined by adopting Texas Tax Code § 141.001. The amici states include the following members and former members of the tax compact: Oregon, Alaska, California, Colorado, Hawaii, Michigan, Minnesota, Montana, New Mexico, and Washington.

As members and former members of the tax compact, the amici states are interested in assisting the court in understanding the party states' interpretation of the compact. In amici's view, correct construction of the tax compact will help preserve each state's sovereign authority over its tax policies, consistent with the members' intent.

No party or counsel for a party in this case authored this brief, in whole or in part, or made a monetary contribution intended to fund the preparation or submission of the brief. No person or entity, other than the State of Oregon, made a monetary contribution intended to fund the preparation or submission of the brief.

## INTRODUCTION

Graphic Packaging, Inc. ("Graphic") argues that Article III.1 of the tax compact takes priority over an apportionment formula in Texas Tax Code § 171.106. Article III.1 provides that a taxpayer subject to a party state's income

1

tax "may elect to apportion and allocate his income in the manner provided by the laws of such state . . . without reference to this compact, or may elect to apportion and allocate in accordance with Article IV." Article IV.9 provides for apportionment of net income based on a formula that gives equal weight to property, payroll, and sales. By contrast, Texas Tax Code § 171.106(a) requires a multistate taxpayer such as Graphic to apportion its taxable margin based solely on gross receipts "[e]xcept as provided by this section." Nothing in Texas Tax Code § 171.106 permits use of the tax compact's three-factor formula.

The amici states agree with the Comptroller of Public Accounts and Attorney General for the State of Texas that (1) the tax compact does not waive any member state's right to adopt an "exclusive" apportionment formula—that is, a formula that automatically applies to multistate taxpayers and precludes those taxpayers from invoking the formula in Article IV.9 of the tax compact—and that (2) any ambiguity on that point must be resolved in favor of each state's reservation of its sovereign tax power. The amici stress the following points.

Graphic argues that the tax compact takes priority over Texas Tax Code § 171.106 based on a body of so-called "compact law" cases that span an assortment of interstate agreements in diverse areas. But most of Graphic's "compact law" cases address compacts that were approved by Congress. Compacts that Congress approves become federal law, to which inconsistent state

2

laws must yield.  As Graphic admits, the tax compact neither received nor required Congressional approval.  Thus, the Compact Clause does not apply to the tax compact, and the compact must be construed as state law.

Because the Compact Clause does not apply, the tax compact would have precluded Texas from enacting a mandatory apportionment formula such as Texas Tax Code § 171.106 only if (1) the legislature, in joining the compact, unmistakably intended to bind future legislatures by contract and (2) Texas Tax Code § 171.106 unconstitutionally impaired existing contractual obligations. Neither conclusion applies.

First, the tax compact does not address, much less address in unmistakable terms, what happens when another state law—such as Texas Tax Code § 171.106—mandates use of an exclusive apportionment formula.  Moreover, nothing in the tax compact purports to trump longstanding prohibitions in many member states' constitutions on suspension of their taxing power—prohibitions that are part of the compact's terms.  The states' intent should be construed in harmony with their constitutions.  Furthermore, nothing in the tax compact unmistakably grants taxpayers a contractual right to enforce Article III.1 as a third-party beneficiary.

Consistent with the intent of each state to preserve its sovereign tax power, the member states' longstanding course of performance further demonstrates that

3

the states have interpreted the tax compact to permit a member state to later adopt an exclusive apportionment formula.  Numerous member states have adopted laws deleting or superseding Article III.1 or IV.  No member state ever has objected.  Indeed, as early as 1972 the states' representatives to the Multistate Tax Commission unanimously ratified the Florida legislature's elimination of Articles III and IV.

In short, the states did not intend to preclude their legislatures from opting out of Article III.1.  Nor did they intend to grant any taxpayer a contractual right to invoke Article III.1 when a state has adopted legislation superseding that provision.

But even if Graphic had a contractual right to the Article III.1 election, Texas Tax Code § 171.106 would not unconstitutionally impair any contractual obligation because no substantial impairment occurred.  Here, Texas Tax Code § 171.106 did not substantially impair a contractual relationship because Graphic had no legitimate expectation that any rights under Article III.1 would exist after 2008, when Texas' revised franchise tax went into effect.  As Graphic appears to concede, each state could withdraw from the tax compact at any time without notice.  Moreover, the compact's provisions were expressly severable.  Thus, Graphic could not legitimately have expected to invoke any right under Article III.1 if Texas had formally withdrawn from the tax compact in 2008 and then reenacted the compact without Articles III.1 and IV.  Because Texas' revised

4

franchise tax had the same effect, it did not substantially impair any contractual obligation.

The amici states ask the court to reject Graphic's reading of the tax compact. Graphic's interpretation is inconsistent with the party states' longstanding understanding of their own agreement. The states entered the tax compact to preserve each state's sovereign power to manage its own fiscal affairs, not to suspend or surrender it.

## ARGUMENT

### I. THE COURT SHOULD REJECT GRAPHIC'S UNCRITICAL RELIANCE ON "COMPACT LAW" CASES.

Graphic asserts that an interstate compact must prevail over subsequent state law under a "body of case law referred to as compact law, because an interstate compact represents both a contract and a binding reciprocal statute. . . ." Graphic Br. at 32. But there is no common law of interstate compacts. Graphic's "compact law" cases do not hold that an interstate compact necessarily precludes later state laws that conflict with compact provisions merely because the compact is an agreement. What authority they provide for the priority of interstate compacts derives solely from the Compact Clause or from federal and state constitutional prohibitions on the impairment of the obligation of contracts.

As Graphic admits, however, the Compact Clause does not apply to the tax compact. Thus, Graphic's "compact law" cases matter only to the extent they

5

analyze whether a state law that is inconsistent with an earlier interstate agreement unconstitutionally impairs the obligation of contracts.

## A. An agreement between sovereign states does not bind a future legislature except under the Compact Clause or Contract Clause.

The fact that sovereign governments enter into agreements with one another by adopting statutes does not, by itself, curtail the sovereignty of future legislatures. "A legislature cannot prevent future legislatures from amending or repealing a statute." *Central Power & Light Co. v. Pub. Util. Comm'n.*, 649 S.W.2d 287, 289 (Tex. 1983). Only federal or state constitutional provisions or federal law may limit a state legislature's power to amend or repeal an earlier statute.

By citing haphazardly from cases involving sundry interstate compacts, Graphic glosses over the *only* sources of law that may require interstate compacts to take priority over later enacted state laws: the Compact Clause[1] or the federal and state Contract Clauses.[2] Ascertaining whether a state law represents an interstate agreement is merely a predicate for determining whether there is a

---

[1] Under the Compact Clause, U.S. Constitution, Article I, § 10, clause 3, "No State shall, without the Consent of Congress . . . enter into any Agreement or Compact with another State . . . ."

[2] Under the Contract Clause, U.S. Constitution, Article I, § 10, clause 1, "No State shall . . . pass any . . . Law impairing the Obligation of Contracts." *See also* Tex. Const. art. I, § 16 ("No . . . law impairing the obligation of contracts, shall be made."). Because the federal and Texas constitutional provisions are "interpreted essentially identically," we focus on the federal clause. *Chandler v. Jorge A. Gutierrez, P.C.*, 906 S.W.2d 195, 203 n.10 (Tex. App.—Austin 1995, writ denied).

6

"Compact" under the Compact Clause or an unconstitutional impairment of the "Obligation of Contracts" under federal and state Contract Clauses. If Congress consents to an interstate compact under the Compact Clause, its consent transforms the compact into federal law, and the compact thus trumps conflicting state law under the Supremacy Clause. But in the case of the tax compact, or any other non-Congressionally-approved compact, later state law may trump provisions in the compact, so long as the later state law does not unconstitutionally impair the obligation of contracts. *See, e.g.*, 1A Norman J. Singer & J.D. Shambie Singer, *Sutherland Statutes and Statutory Construction* § 32:8 (7th ed. 2009) (describing state's authority to abrogate non-Congressionally-approved compact as limited by "the constitutional prohibition against impairing the obligation of contract").

B. **Because the Compact Clause does not apply to the tax compact, Graphic's reliance on "compact law" cases decided under that clause is misplaced.**

Compacts that receive Congressional consent under the Compact Clause constitute federal law. As a result, a state law that conflicts with a Congressionally-approved compact must yield to that compact under the Supremacy Clause, U.S. Constitution, Article VI, § 2. *See Cuyler v. Adams*, 449 U.S. 433, 440, 101 S.Ct. 703, 708 (1981) (holding that "[t]he consent of Congress transforms the States' agreement into federal law under the Compact Clause"). Graphic thus misstates the law when it claims that "Congressional consent *plays no*

7

*role*" in explaining why an interstate compact may trump a later state law that conflicts with that compact. Graphic Br. at 34 (emphasis added). If Congress has approved an interstate compact, the Supremacy Clause makes that Congressionally-approved compact binding on the states, and does so regardless of future state legislation—no "additional" reasons need be considered. Graphic Br. at 34; *see Tarrant Reg'l Water Dist. v. Herrmann*, 569 U.S. __, 133 S.Ct. 2120, 2130 n.8 (2013) ("The Supremacy Clause…ensures that a congressionally approved compact, as a federal law, preempts any state law that conflicts with the Compact").

Because the lion's share of "compact law" cases that Graphic cites address Congressionally-approved compacts, Graphic's uncritical reliance on those cases—for its assertion that the tax compact automatically takes precedence over later state laws—is unwarranted: As Graphic acknowledges, the Compact Clause does not apply to the tax compact because Congressional consent was neither required nor given. *See* Graphic Br. at 38; *United States Steel Corp. v. Multistate Tax Commission*, 434 U.S. 452, 473, 98 S.Ct. 799 (1978) (holding that tax compact did not "enhance[] state power quoad the National Government" and therefore did not require Congressional consent).

As a non-Congressionally-approved compact, the tax compact "must be construed as state law," not federal. *McComb v. Wambaugh*, 934 F.2d 474, 479 (3d Cir. 1991); *In re Alexis O.*, 959 A.2d 176, 180 (N.H. 2008). While cases construing compacts covered by the Compact Clause *may* be persuasive in other respects, *e.g.*, in applying principles of contractual interpretation, they do not establish that the tax compact automatically overrides subsequent state law.

**C. Because the tax compact did not require or receive Congressional consent, the compact trumps Texas Tax Code § 171.106 only if Texas Tax Code § 171.106 unconstitutionally impairs the obligation of contracts.**

A non-Congressionally-approved interstate compact *may* take precedence over a subsequent state statute, but only if that statute unconstitutionally impairs the obligation of contracts. Again, Graphic errs by viewing so-called "compact law" cases as a distinct source of authority. *See* Graphic Br. at 45-6 (concluding that "fundamental principles of compact law" require application of Article III.1 and only later arguing that Texas Tax Code § 171.106 "also" violates Contract Clause).

Of the few "compact law" cases Graphic cites that involve non-Congressionally-approved compacts, none holds that the compact at issue overrode subsequent state law absent an unconstitutional impairment of contractual obligations. The court in *In re D.B.*, 431 A.2d 498 (Vt. 1981) merely held that the Interstate Compact on Juveniles was valid notwithstanding lack of Congressional

9

consent.  In *General Expressways, Inc. v. Iowa Reciprocity Board*, 163 N.W.2d 413, 419-420 (Iowa 1968), the court found that the compact at issue and a subsequent statute were consistent.  In each case, the court had no need to decide whether a later statute substantially impaired contractual relationships.

In both *McComb*, 934 F.2d 474, and *In re C.B.*, 188 Cal.App.4th 1024, 116 Cal.Rptr.3d 294 (2010), the courts struck down a state regulation that exceeded the scope of the statutory compact it was meant to interpret—a familiar principle of administrative law.  The courts then held that the statutory compact did not apply to the factual situation presented.  The courts thus had no need to address whether the compact took precedence over later state statutes, and broad statements to that effect in *McComb* are *dicta*.

Finally, Graphic's reliance on *In re O.M.*, 565 A.2d 573 (D.C. Ct. App. 1989), which held that the District of Columbia properly ratified and participated in the Interstate Compact on Juveniles following Congressional authorization, is erroneous in two critical  respects.  First, the D.C. Court of Appeals observed that Congress itself "expressly commanded" the D.C. courts "to enforce the Compact according to its terms."  565 A.2d at 579.  No Congressional mandate to the Texas Court of Appeals is at issue in Graphic's appeal.

Second, as the court in *In re O.M.* noted,

> [t]his case does not present . . . the issue of whether an interstate
> compact which is not federal law may or must be enforced by the

courts. The District is not asserting, through an unequivocal, unanimous, and consistent argument by its highest political authorities, that the Compact should not be enforced in this case.

*Id.* By contrast, here the Comptroller maintains, and the amici states agree, that Article III.1 and Article IV of the tax compact are not enforceable as binding contractual terms; instead, they are provisions from which party states are free to subsequently deviate without withdrawing from the entire compact.

In sum, Graphic's snippets from a medley of "compact law" cases fail to establish that Article III.1 of the tax compact takes priority over Texas Tax Code § 171.106. A non-Congressionally-approved compact—such as the tax compact— does not automatically trump later-enacted state statutes. Instead, it does so only if the subsequent state statute violates constitutional prohibitions on laws impairing the obligation of contracts.

## II. THE TAX COMPACT PERMITS MEMBER STATES TO ADOPT AN EXCLUSIVE APPORTIONMENT FORMULA SUCH AS TEXAS TAX CODE § 171.106

Framing Graphic's primary contention solely within the boundaries of the Contract Clause matters for two reasons. First, because of the severe consequences that may ensue when an earlier legislature binds future legislatures under the Contract Clause, a future legislature is constrained only when the earlier legislature's contractual intent to do so is unmistakable. Here, there is no unmistakable intent that Texas and other party states intended either (1) to bargain

11

away their sovereign power to enact an exclusive apportionment formula or (2) to grant taxpayers contractual rights under Article III.1 of the tax compact.

Second, even if the states unmistakably intended to vest taxpayers with contractual rights under Article III.1, the Contract Clause would not automatically be violated whenever a party state adopted a mandatory apportionment formula. Rather, courts must apply a multistep analysis: they first must determine whether any impairment is substantial. If an impairment is substantial, courts next must assess whether that impairment is reasonable and necessary for an important public purpose; if it is, no constitutional violation has occurred. Here, Texas Tax Code § 171.106 did not substantially impair any contractual relationship and therefore could not violate the Contract Clause.

### A. The states did not unmistakably intend to suspend their power to adopt an exclusive apportionment formula.

Under the unmistakability doctrine, the state's sovereign power may not "'be held . . . to be surrendered, unless such surrender has been expressed in terms too plain to be mistaken.'" *United States v. Winstar Corp.*, 518 U.S. 839, 874-75, 116 S.Ct. 2432 (1996) (quoting *Jefferson Branch Bank v. Skelly*, 66 U.S. (1 Black) 436, 446, 17 L.Ed. 173 (1862)). The unmistakability doctrine has "served the dual purposes of limiting contractual incursions on a State's sovereign powers and of avoiding difficult constitutional questions about the extent of state authority to limit the subsequent exercise of legislative power." *Winstar*, 518 U.S. at 875. As

12

a result, contracts restricting a state's future exercise of its taxing power "generally have not received a sympathetic construction." *United States Trust Co. of New York v. New Jersey*, 431 U.S. 1, 24 n.21, 97 S.Ct. 1505 (1977). Instead, the "legislature is not to be presumed to have relinquished its power of taxation beyond the narrowest rational reading . . . ." *Atlantic Coast Line R. Co. v. Phillips*, 332 U.S. 168, 173, 67 S.Ct. 1584 (1947).

In the absence of express and unmistakable language waiving the exercise of the sovereign tax power, each state must be presumed to have reserved that power. *See Winstar*, 518 U.S. at 878 ("unmistakability [is] needed for waiver, not reservation" of sovereign power). The tax compact contains no such unmistakable language. Nothing in the tax compact expressly prohibits the states from adopting an exclusive apportionment formula that overrides the formula in Article IV.9. Nor does the tax compact expressly prevent states from limiting the conditions in which Articles III.1 and IV may apply, from amending Articles III.1 and IV, or from deleting them altogether.

Neither does the tax compact expressly and unmistakably make taxpayers contractual, third-party beneficiaries of Article III.1. Even under general contract-law principles, "all presumptions [are] invoked against liability to the third party." *MJR Corp. v. B&B Vending Co.*, 760 S.W.2d 4, 15 (Tex. App.—Dallas 1988, writ denied). In the case of contracts with governments, those presumptions are even

13

stronger. *See, e.g.*, J. Murray, *Corbin on Contracts* § 45.6 at 92 (rev. ed. 2007) ("The distinction between an intention to benefit a third party and an intention that the third party should have the right to enforce that intention is emphasized where the promisee is a governmental entity.").

The historical background likewise permits no inference that the states unmistakably considered Articles III.1 and IV as contractually binding terms, as opposed to ordinary statutory provisions promoting uniform laws. The tax compact's history shows that the states entered into the compact to preserve each state's sovereign power to determine its own substantive tax policies, not to suspend it by contract. That intent conflicts with Graphic's assertion that "[u]pon entering into an interstate compact, a state effectively surrenders a portion of its sovereignty . . . ." Graphic Br. at 33 (quoting *C.T. Hellmuth v. Washington Metro. Area Transit Auth.*, 414 F.Supp. 408, 409 (D. Md. 1976)). The states did not intend to protect their tax powers from federal interference only to permit contractual interference by other states and taxpayers. Rather, they intended to retain unfettered control over their own tax policies.[3]

---

[3] As the State of Texas observes, Articles III and IV of the tax compact are merely "advisory." Brief of Appellees at 42-55. The Multistate Tax Commission long ago emphasized to the United States Supreme Court in *Multistate Tax Commission* that the tax compact is an "advisory mechanism," with each member "retain[ing] exclusive control over any and all legislation and administrative actions. . . ." *See* Brief of Multistate Tax Commission in *Multistate Tax Commission*, United States Supreme Court No. 76-635, 1977 WL 189138 at 12; Brief of Appellees at 54-55; *see also Multistate Tax Comm'n*, 434 U.S. at 457.

14

In fact, as the State of Texas observes, many members of the tax compact were prohibited by their own state constitutions from contractually binding themselves to substantive tax policies. Brief of Appellees at 61-62. The constitutions of fourteen former and current member states, including Texas, provide that the state may not suspend or surrender the power of taxation by contract.[4] A state's sovereign power of taxation encompasses not merely whether to tax, but also how to tax, including the method of computing taxes using an apportionment formula.

Accordingly, any interpretation that views the states as collectively promising that their legislatures would be powerless to modify or eliminate Article III.1 or Article IV without repealing the compact altogether inserts into the tax compact an obligation that would be illusory: any such promise would exceed the state constitutional authority possessed by a significant number of compact members. *See Skelly*, 66 U.S. at 448 (noting that "state legislatures, *unless prohibited in terms by state constitutions*, may contract by legislation to release the exercise of taxing" corporations) (emphasis added). Reading into the tax compact a contractual obligation not to modify or eliminate Article III.1 or IV would ignore

---

[4] Tex. Const. art VIII, § 4 ("The power to tax corporations . . . shall not be surrendered or suspended by act of the Legislature, by any contract or grant to which the State shall be a party."); *see also* Alaska Const. art. IX, § 1; Ark. Const. art. 16, § 7; Cal. Const. art. XIII, § 31; Haw. Const. art. VII, § 1; Ill. Const. art. IX, § 1; Mich. Const. art. IX, § 2; Minn. Const. art. X, § 1; Mo. Const. art. X, § 2; Mont. Const. art. VIII, § 2; N.D. Const. art. X, § 2; S.D. Const. art. XI, § 3; Wash. Const. art. VII, § 1; Wyo. Const. art. 15, § 14.

that "[t]he obligations of a contract long have been regarded as including not only the express terms but also the contemporaneous state law pertaining to interpretation and enforcement." *United States Trust Co. of New York v. New Jersey*, 431 U.S. 1, 19 n.17, 97 S.Ct. 1505 (1977) (internal citations and quotations omitted); *see also General Motors Corp. v. Romein*, 503 U.S. 181, 189, 112 S.Ct. 1105 (1992) ("The obligation of a contract consists in its binding force on the party who makes it. This depends on the laws in existence when it is made. . . .") (internal quotation and citation omitted).

Because the preexisting prohibitions in many party states' constitutions must be considered part of the tax compact "as if they were expressly referred to or incorporated in its terms," the states should be presumed to have enacted Articles III.1 and IV of the tax compact merely as statutory law that subsequent legislatures were free to revisit, not as binding contractual terms. *United States Trust*, 431 U.S. at 19 n.17. Limiting a later legislature's freedom to exercise the tax power as long as the tax compact is in effect would suspend the legislature's tax power in violation of the constitutions of many party states.

Graphic notes that Article X.2 of the tax compact permits states to withdraw from the tax compact at any time without notice. Graphic then argues that Article X.2 shows that each state intended to contractually limit its future exercise of the tax power unless and until it withdrew from the compact as a whole. Graphic is

16

mistaken. The withdrawal provision neither expressly nor implicitly prohibits the states from otherwise deleting or amending Articles III.1 or IV, either upon adoption or subsequently.

Moreover, Article XII of the tax compact provides that "[t]he provisions of this compact shall be severable. . . ." Nothing in the tax compact provides that Articles III.1 and IV are inseparable parts of the compact, nor does anything prevent the compact members from omitting or eliminating one or more of those provisions while continuing to participate in the tax compact in other respects.

The unmistakability doctrine, the lack of express restrictions in the tax compact on the states' power to delete or amend Articles III.1 and IV, the prohibition in many states' constitutions on contractual suspensions of the tax power, and the severability provision indicate that the states intended Articles III.1 and IV to be subject to revision by future legislatures, not as binding contractual terms.

**B.    The states' course of performance confirms that each state intended to retain sovereign authority to adopt an exclusive apportionment formula without first withdrawing from the compact under Article X.2.**

"The parties to an agreement know best what they meant, and their action under it is often the strongest evidence of the meaning." *Restatement (Second) of Contracts* § 202, *comment g* (1981). At worst, the unmistakability doctrine, the states' constitutional prohibitions on contractual suspensions of the tax power, and

17

the tax compact's silence regarding the states' reserved powers to amend or eliminate Articles III.1 and IV would reflect an ambiguity in the construction of the compact. As a result, the parties' "course of performance . . . is highly significant evidence of [their] understanding of the compact's terms . . . ." *Tarrant Regional Water Dist.*, 133 S.Ct. at 2135; *see also Droemer v. Transit Mix Concrete of Gonzales, Inc.*, 457 S.W.2d 332, 335 (Tex. App.—Corpus Christi 1970, no writ) ("If a contract is doubtful or ambiguous in its meaning, the acts of the parties themselves, in the course of the performance of the contract, are entitled to great weight to aid the court in its interpretation."). Here, the member states' course of performance demonstrates that Article III.1 was not intended as a binding contractual term that would prevent future legislatures from overriding it.

To state the obvious, the parties to the tax compact are states whose legislatures have adopted it. The states have long allowed each other to depart from Articles III.1 and IV while continuing to participate as full compact members. For example, when Florida amended the tax compact by eliminating Articles III and IV in 1971, the party states unanimously ratified Florida's continued membership, declaring in 1972 that Florida was "adhering to the spirit of the Compact" and resolving that "Florida be recognized as a member in good standing

18

of the Multistate Tax Compact and the Multistate Tax Commission." CR.487.[5]

Between 1987 and 1995, five party states—Minnesota, California, Idaho, Oregon, and Arkansas—similarly adopted laws that eliminated or superseded Article III.1. Minnesota amended its tax compact statute by eliminating Articles III and IV.[6] California and Idaho each adopted statutes mandating use of a double-weighted sales factor "[n]otwithstanding" the tax compact.[7] Oregon adopted legislation resolving any inconsistency between the tax compact and its separately codified version of the Uniform Division of Income for Tax Purposes Act

---

[5] Graphic mistakenly implies that in 1972 Florida retained an equally-weighted three-factor formula for taxpayers who would have been subject to Article IV. *See* Reply Brief of Appellant at 17 ("Fla. Stat. § 214.71 set forth the same formula as Compact Article IV."). In fact, Fla. Stat. § 220.15(4) provided: "In lieu of the equally weighted three-factor apportionment fraction based on property, payroll, and sales which is described in s. 214.71, there shall be used for purposes of the tax imposed by this Code an apportionment fraction composed of a sales factor representing 50% of the fraction, a property factor representing 25% of this fraction, and a payroll factor representing 25% of the fraction." *See* 1971 Fla. Laws ch. 71-984 § 1 (eff. Jan. 1, 1972).

[6] *See* 1987 Minn. Laws 1039, 1098-1120; *Firstar Corp. v. Comm'r*, 575 N.W.2d 835, 838 (Minn. 1998) (discussing history). The validity of Minnesota's elimination of Articles III and IV in 1987 currently is before the Minnesota Tax Court in *Kimberly-Clark Corp. and Subsidiaries v. Commissioner*, No. 8670-R. In 2013, Minnesota repealed the tax compact. *See* 2013 Minn. Laws 143.

[7] *See* Cal. Rev. & Tax Code § 25128(a) (1993) (prescribing use of double-weighted sales factor formula "[n]otwithstanding § 38006 [the tax compact]"); 1993 Cal. Stat. 946 (S.B. 1176); Idaho Code § 63-3027(i)(1) (requiring use of double-weighted sales factor formula "[n]otwithstanding the election allowed in article III.1 of the multistate tax compact . . . ."); 1994 Idaho Sess. Laws 301 (H.B. 897). The validity of California's 1993 legislation currently is before the California Supreme Court in *Gillette Co. and Subsidiaries v. California Franchise Tax Board*, S206587. Texas, on behalf of eighteen states and the District of Columbia, has filed a Brief of Amici Curiae in support of the Franchise Tax Board. In 2012, California repealed the tax compact. 2012 Cal. Stat. 37 (S.B. 1215).

("UDITPA") in favor of the latter.[8] Arkansas directly amended the apportionment formula in *both* Article IV of the tax compact *and* its separately enacted version of UDITPA.[9] As the State of Texas observes, nothing in the records of the Multistate Tax Commission indicates that the party states have objected to these legislative acts amending or overriding Article III.1 or IV or to later similar actions taken by other states.[10] *See* Brief of Appellees at 13.

---

[8] *See* Or. Rev. Stat. § 314.606 (1993) ("In any case in which the provisions of ORS 314.605 to 314.675 are inconsistent with the provisions of ORS 305.655 [the tax compact], the provisions of ORS 314.605 to 314.675 shall control."); 1993 Or. Laws 726, § 20 (H.B. 2058); Or. Rev. Stat. § 314.650(1) (1993) (prescribing use of double-weighted sales factor). The validity of Or. Rev. Stat. § 314.606 currently is before the Oregon Tax Court in *HealthNet, Inc. and Subsidiaries v. Department of Revenue*, TC No. 5127. Texas, on behalf of 12 states, has filed a Brief of Amici Curiae in support of the Oregon Department of Revenue. In 2013, Oregon formally withdrew from the tax compact and readopted it without Articles III and IV. *See* 2013 Or. Laws 407 (S.B. 307); Or. Rev. Stat. § 305.653 (2013).

[9] *See* Ark. Code Ann. § 26-5-101 (1995) (amending Article IV.9); Ark. Code Ann. § 26-51-709 (amending UDITPA formula); 1995 Ark. Acts 682.

[10] Other jurisdictions include Colorado, Utah, Alabama, the District of Columbia, Michigan, and North Dakota. *See* Colo. Rev. Stat. § 24-60-1301 (Article III.1 deleted effective January 1, 2009); Colo. Rev. Stat. § 39-22-303.5(2) (2009) (mandating apportionment using single sales factor formula for tax years beginning on or after January 1, 2009); 2008 Colo. Sess. Laws 256 (H.B. 08-1380); 2010 Utah Sess. Laws 155, § 1 (S.B. 165) (directly amending apportionment formula in Article IV); Ala. Code § 40-27-1 (2011) (amending Article IV); 2011 Ala. Acts 2011-616 (H.B. 434); D.C. Code § 47-411 (2013); 2013 D.C. Stat. 20-61, § 7342 (repealing tax compact and readopting compact without Articles III and IV); Mich. Comp. Laws § 208.1301; N.D. Cent. Code § 57-59-01, *as amended by* S.B. 2292 (2015) (deleting Articles III and IV). In *International Business Machines Corp. v. Department of Treasury*, 852 N.W.2d 865 (Mich. 2014), four justices of the Michigan Supreme Court held that Article III.1 remained in effect for the tax years at issue as a matter of Michigan statutory law, without addressing the constitutional issue here. Three justices would have held that the Michigan legislature impliedly repealed Article III.1 without violating any constitutional provisions. Subsequently, Michigan retroactively repealed the tax compact. *See* 2014 Mich. Pub. Acts 282. The Michigan Court of Claims recently upheld that retroactive repeal, finding that the tax compact was merely advisory and that the retroactive repeal did not impair any contractual obligations. *See Ingram Micro. Inc. v. Mich. Dep't. of Treasury*, No. 11-000035-MT, slip op. (Mich. Ct. Cl. Dec. 19, 2014) (appeal pending).

**C. Construing the tax compact as the amici suggest does not require the court to insert "absent terms," but rather to discern the states' intent using constructional principles under the Contract Clause.**

Here, the State maintains, and the amici states agree, that when Texas joined the tax compact, it reserved the right to exercise its sovereign tax power by eliminating the Article III.1 election without withdrawing from the tax compact under Article X.2. Graphic, however, argues that the State thereby seeks to insert what is omitted into the tax compact. In support, Graphic quotes the statement, in *Alabama v. North Carolina*, 560 U.S. 330, 352, 130 S.Ct. 2295 (2010), that the Court is "especially reluctant to read absent terms into an interstate compact . . . ." Graphic Br. at 41. Graphic errs.

Graphic's reliance on *Alabama v. North Carolina* highlights the errors of selectively quoting from "compact law" cases involving Congressionally-approved compacts and of overlooking the constructional principles that apply under the Contract Clause. *Alabama v. North Carolina* involved the construction of a Congressionally-approved compact for the creation of regional radioactive waste facilities in the southeastern United States. Because Congress approved the compact at issue in *Alabama v. North Carolina*, that compact became federal law.

The radioactive waste compact's status as federal law is critical in explaining the Court's refusal to read "absent terms"—there, an implied duty of good faith—into that compact. The Court's reluctance stemmed expressly from

21

"federalism and separation-of-powers concerns"—concerns that arose because Congress had transmuted the compact into federal law. 560 U.S. at 352. In the sentences immediately preceding Graphic's quote, the Court explained that "an interstate compact is not *just* a contract; it is a federal statute enacted by Congress . . . . We do not—we cannot—add provisions to a federal statute. And *in that regard* a statute which is a valid interstate compact is no different." *Id.* at 351-52 (emphases added). The Court noted that Congress had approved similar interstate compacts by other states authorizing regional radioactive waste facilities and that those compacts included an explicit duty of good faith. The Court therefore would not insert what had been omitted in a federal statute when other Congressionally-approved compacts on a similar subject included "express good-faith limitations upon a State's exercise of its rights." *Id.* at 353.

More generally, the Court in *Alabama v. North Carolina* did not consider the constructional principles that must be applied under the Contract Clause here. The Court had no need to consider whether a state unmistakably waived its sovereign tax power or unmistakably conferred contractual rights on nonparty taxpayers. Nor did the Court have occasion to apply the rule that "the laws which subsist at the time and place of the making of a contract . . . enter into and form a part of it, as if they were expressly referred to or incorporated in its terms." *United States Trust*, 431 U.S. at 19 n.17 (internal citations and quotations omitted). Here the

22

member states' constitutional prohibitions on suspension of the tax power are *incorporated* terms of the tax compact, not "absent" terms.

Furthermore, as the case caption in *Alabama v. North Carolina* demonstrates, the states disagreed regarding that compact's interpretation. By contrast, the members of the tax compact have no disagreement with Texas here, but rather a longstanding and consistent course of conduct. The member states expressly consented to Florida's elimination of Articles III and IV, and no state has objected to the actions of other legislatures that eliminated or amended Articles III.1 and IV.

Since Graphic acknowledges that Congress never has consented to the tax compact, the Court's federalism concerns in *Alabama v. North Carolina* that made it reluctant to read absent terms into the compact there are irrelevant to this case. The party states adopted the tax compact as a statute, knowing that many states' constitutions prohibited contractual suspensions of the tax power and that the compact's provisions were severable. The states, individually and collectively, could not unmistakably have intended Articles III.1 and IV as mutually binding contractual terms that suspended each state's power to adopt an exclusive tax apportionment formula, given that many of their constitutions prohibited such contractual suspensions.

23

**D.** **The threat of Congressional action in 1967 does not show that the states intended Article III.1 to contractually bind subsequent state legislatures.**

Graphic notes that the states drafted the tax compact in 1966 and 1967 in response to the threat of federal legislation. According to Graphic, Article III.1 "guarantee[d] enough uniformity" to help the tax compact "gain[] the support of enough party states . . . to convince Congress it no longer needed to act" and "was at the heart of the deal that was struck . . . to stave off Congressional preemption." Graphic Br. at 45. Graphic thus asks this court to infer, based on a history of *Congressional* inaction, that the *states* intended Article III.1 as a contractual term binding future legislatures. This court should decline the invitation.

First, Congress was not a party to the tax compact. Its consent was neither required nor received. In emphasizing the concerns of a nonparty, Graphic ignores the party states' overarching motivation for the tax compact—the preservation of each state's sovereign authority to adopt its own tax laws.

Second, even assuming Congressional intent were pertinent to the tax compact's construction, it is impossible to divine that intent from a history of Congressional inaction. Bills may fail in Congress for a multitude of reasons. *See United States v. Price*, 361 U.S. 304, 310-311, 80 S.Ct. 326 (1960) ("Whether Congress thought the proposal unwise . . . or unnecessary, we cannot tell; accordingly, no inference can properly be drawn from the failure of the Congress

24

to act"). In fact, there is no indication that the tax compact or any particular provision within it was directly responsible for Congressional inaction. Federal proposals to regulate state taxation of multistate corporations failed many times before and after the tax compact's adoption in 1967.[11] Federal legislation would have regulated taxation in all 50 states, whereas the tax compact's membership, which did not include large states like New York or Pennsylvania, has hovered at approximately 20 members since the early 1970s. *See Multistate Tax Commission*, 434 U.S. at 454 n.1.

Nor did Congressional inaction reflect a "deal" to induce taxpayers to forgo lobbying for federal legislation. Graphic Br. at 45. There was no "deal" with Congress or taxpayers. Indeed, large multistate taxpayers subsequently challenged the tax compact's validity. *See Multistate Tax Commission*, 434 U.S. at 458. Taxpayers are not parties to the tax compact, nor are they third-party beneficiaries.

Accordingly, the historical context in which the states adopted the tax compact does not indicate an unmistakable intent to adopt Article III.1 as a binding

---

[11]  Unsuccessful federal legislation to regulate state taxation of multistate corporations included H. R. 11798, 89th Cong., 1st Sess. (1965); H.R. 16491, 89th Cong., 2d Sess. (1966); H.R. 2158, 90th Cong., 1st Sess. (1967); H.R. 2179, 91st Cong., 1st Sess. (1969); H.R. 7906, 91st Cong., 1st Sess. (1969); S. 916, 91st Cong., 1st Sess. (1969); H.R. 1538, 92d Cong., 1st Sess. (1971); S. 317, 92d Cong., 1st Sess. (1971); S. 1210, 92d Cong., 1st Sess. (1971); S. 1883, 92d Cong., 1st Sess. (1971); H.R. 1538, 92d Cong., 2d Sess. (1972); S. 3333, 92d Cong., 2d Sess. (1972); S. 4080, 92d Cong., 2d Sess. (1972); H.R. 977, 93d Cong., 1st Sess. (1973); S. 282, 93d Cong., 1st Sess. (1973); S. 1245, 93d Cong., 1st Sess. (1973); S. 2092, 93d Cong., 1st Sess. (1973); H.R. 9, 94th Cong., 1st Sess. (1975); S. 2080, 94th Cong., 1st Sess. (1975). Nor did Congress adopt any of numerous bills that sought its consent to the tax compact. *See Multistate Tax Commission*, 434 U.S. at 458 n.8.

contractual term. The historical context shows that each state intended to preserve its sovereign tax power, not to contractually limit it in violation of many of their constitutions.

## III. TEXAS TAX CODE § 171.106 DOES NOT SUBSTANTIALLY IMPAIR ANY CONTRACTUAL RELATIONSHIP

Graphic has no contractual rights under the tax compact. But even if Article III.1 were a binding contractual term that gave Graphic contractual rights as a third-party beneficiary, Texas Tax Code § 171.106 would be constitutionally valid. "The threshold inquiry [under the federal Contract Clause] is whether the state law has, in fact, operated as a substantial impairment of a contractual relationship." *Energy Reserves Group, Inc. v. Kansas Power & Light Co.*, 459 U.S. 400, 411, 103 S.Ct. 697 (1983) (internal quotations and citations omitted). If a state law substantially impairs a contractual relationship, the inquiry turns to whether that impairment "is reasonable and necessary to serve an important public purpose." *United States Trust*, 431 U.S. at 25. Here, however, no substantial impairment occurred.[12]

---

[12] The amici states focus here on issues common to the construction of the tax compact. Amici also agree with the State of Texas that, even if there were a substantial impairment of a purported contractual obligation to a third-party taxpayer, the Contract Clause still would not be violated. First, Texas Tax Code § 171.106 serves an important public purpose. Second, any impairment of contractual obligations under the tax compact would be reasonable and necessary in serving that purpose. *See* Brief of Appellees at 66-67.

A substantial impairment occurs only if there is a contractual relationship, a change in law impairs that contractual relationship, and the impairment is substantial. *See General Motors*, 503 U.S. at 186. Graphic argues that it had a contractual right under Article III.1 to employ the apportionment formula in Article IV.9 of the tax compact and that Texas Tax Code § 171.106 eliminated, and thereby impaired, that right. As argued above, the amici states do not believe Graphic had a contractual right. But even assuming Graphic were correct, Texas Tax Code § 171.106 did not result in a *substantial* impairment.

In evaluating the severity of an impairment, one considers "the legitimate expectations of the contracting parties," including reasonable reliance. *United States Trust*, 431 U.S. at 19 n.17. In *Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 246, 98 S.Ct. 2716 (1978), for example, the Court held that a law that *retroactively* modified the amount required to be contributed to a pension plan substantially impaired contractual obligations when the company had "relied heavily, and reasonably, on [its] legitimate contractual expectation in calculating its annual contributions to the pension fund." But a state law that "restricts a party to gains it reasonably expected from the contract does not necessarily constitute a substantial impairment." *Energy Reserves*, 459 U.S. at 411.

If Graphic had any contractual right to employ Article III.1 before Texas revised its franchise tax in 2006 effective in 2008, Texas Tax Code § 171.106 still

27

left Graphic with the "gains it reasonably expected" under the tax compact *after* 2006. *Id.* Graphic concedes that Texas would not have impaired any contractual rights Graphic may have had if, in 2006, Texas had withdrawn from the tax compact altogether, as permitted by Article X.2. Graphic Br. at 40. But Graphic's insistence that the State's only constitutional recourse was to withdraw under Article X.2—as opposed to simply adopting legislation opting out of Articles III.1 and IV—is an insistence on procedural formality over substance. Suppose, for example, that a party state repealed the tax compact, readopted the compact later the same year without Articles III and IV, and simultaneously adopted a mandatory apportionment formula. Suppose, further, that the other states had no objection to the state's continued membership in the compact. Under those circumstances, Graphic could not reasonably expect to *continue* to benefit from anything in Articles III.1 or IV.

Likewise, the fact that a state, instead of formally withdrawing and readopting the tax compact without Articles III.1 and IV, either simply deleted or restricted the operation of those two provisions would not change the end result. No taxpayer would have had a legitimate expectation that the state continued to bind itself to allow the Article III.1 election.

Accordingly, if the Texas legislature impliedly eliminated Article III.1 when it revised its franchise tax in 2006 effective in 2008, it left the party states and

taxpayers in the same position as if Texas had withdrawn from the tax compact and readopted it without Article III.1. Assuming Graphic ever had contractual rights to make an election under Article III.1 before 2008, it could have no reasonable expectation that Article III.1 applied for tax years 2008 to 2010. Because Texas Tax Code § 171.106 does not substantially impair any contractual relationship, it cannot violate the Contract Clause.

## CONCLUSION

The court should affirm the trial court's judgment sustaining the Comptroller's denial of Graphic's refund claims for tax years 2008 to 2010 and the Comptroller's assessment for 2010.

DATED this 13th day of May 2015.

Respectfully submitted,

ELLEN F. ROSENBLUM
Attorney General of Oregon

ANNA JOYCE
Solicitor General

**/s/ Darren Weirnick_____**
DARREN WEIRNICK
Senior Assistant Attorney General
Of Attorneys for Amici Curiae States of
Oregon, et al.

**CERTIFICATE OF COMPLIANCE**

This brief complies with the typeface requirements Texas Rule of Appellate Procedure 9.4(e) because it has been prepared in a conventional typeface no smaller than 14-point for text and 12-point for footnotes.  This document also complies with the word-count limitation of Texas Rule of Appellate Procedure 9.4(i)(2)(B) because it contains 7,363 words, excluding the parts of the brief exempted by Rule 9.4(i)(1).

**/s/ Darren Weirnick**_____
Darren Weirnick

## CERTIFICATE OF SERVICE

I certify that the foregoing Brief of *Amici Curiae* States of Oregon et al. was electronically filed with the Clerk of the Court using the electronic case filing system of the Court. I also certify that a true and correct copy of the foregoing was served via e-service or e-mail on the following counsel of record on May 13, 2015.

Amy L. Silverstein
asilverstein@sptaxlaw.com
**SILVERSTEIN & POMERANTZ LLP**
12 Gough Street, Second Floor
San Francisco, California 94103
Tele: (415) 593-3502
Fax: (415) 593-3501

James F. Martens
jmartens@textaxlaw.com
Amanda G. Taylor
ataylor@textaxlaw.com
Lacy L. Leonard
lleonard@textaxlaw.com
Danielle Ahlrich
dahlrich@textaxlaw.com
**MARTENS, TODD, LEONARD & TAYLOR**
301 Congress Avenue, Suite 1950
Austin, Texas 78701
Tele: (512) 542-9898
Fax: (512) 542-9899

**COUNSEL FOR APPELLANT**

Rance Craft
Assistant Solicitor General
Rance.craft@texasttorneygeneral.gov
Cynthia A. Morales,
Assistant Attorney General
Cynthia.morales@texasattorneygeneral.gov
**OFFICE OF THE ATTORNEY GENERAL**
P.O. Box 12548 (MC 059)
Austin, Texas 78711-2548
Tele: (512) 936-2872
Fax: (512) 474-2697

**COUNSEL FOR APPELLEES**

**/s/Darren Weirnick_____**
Darren Weirnick

31